**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MARK J., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 18 C 8479 |
| v. | ) |
| | ) Magistrate Judge Jeffrey Cummings |
| ANDREW SAUL, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Claimant Mark J. ("Claimant")[1] brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") that denied Claimant's claim for a period of disability and Disability Insurance Benefits ("DIB") under 42 U.S.C. §§ 416(i) and 423(d) of the Social Security Act. The Commissioner has brought a cross-motion for summary judgment seeking to uphold the Social Security Agency's decision to deny benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 138(c)(3). For the reasons stated below, Claimant's motion for summary judgment [14] is granted and the Commissioner's motion for summary judgment [21] is denied.

**I. BACKGROUND**

    **A.    Procedural History**

On September 4, 2015, Claimant filed a Title II application alleging a disability onset date of August 20, 2015. His claim was denied initially on December 29, 2015 and upon

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an opinion. Therefore, only the claimant's first name shall be listed in the caption. Thereafter, we shall refer to Mark J. as Claimant.

1

reconsideration on April 20, 2016. On February 23, 2018, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant. The Appeals Council denied review on December 10, 2018, making the ALJ's decision the Commissioner's final decision. (R. 1). *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in District Court.

B. **Medical Evidence**

1. **Evidence From the Medical Records**

Claimant suffers from Crohn's disease accompanied by abdominal pain, occasional diarrhea, and Crohn's-related joint pain. Claimant suffered from these conditions while he was still working as an IT manager for Walgreens Corporation prior to his alleged onset date of August 20, 2015. An office visit on July 29, 2015, however, showed that he had normal bowel movements following treatment of Crohn's with Prednisone. (R. 496). The record suggests that some of Claimant's symptoms such as diarrhea fluctuated from time to time. On September 10, 2015, he reported that he had experienced diarrhea for four days in a row. (R. 492). Claimant experienced only occasional diarrhea in November 2015 and had regular bowel movements in December, 2015. (R. 482, 546). That said, Claimant also complained on December 21, 2015 that he was experiencing serious abdominal pain at a level of eight out of ten. (R. 546). By May 11, 2016, Claimant denied diarrhea, joint pain, or abdominal pain. (R. 781). He had no bowel tenderness on June 20, 2016 but was then assessed with chronic pain on August 25, 2017. (R. 792, 1231). Claimant's treating gastroenterologist Dr. Cynthia Wait noted on that date that his Crohn's symptoms were "well controlled" with medication that included Aprison, Azathioprine, and Humira. (R. 1233).

2

Claimant also experiences Crohn's-related arthritis that presented as swelling in his right ankle in February 2016. (R. 775). A March 2016 MRI showed hints of a split tear in a tendon, mild tenosynovitis,[2] and a possible ankle sprain. (R. 681). By June 2016, treating expert Dr. Lori Siegel noted that Claimant was experiencing pain at a level of seven out of ten even though his Crohn's was under "fair control." (R. 699). Humira injections were given to treat his condition. Claimant reported little change in his ankle pain in July 2016 and again in October 2016. (R. 690, 696). By January 2017, however, Claimant reported that additional injections had brought him significant relief but that his condition "flared" once again when he missed three weeks of Humira shots. (R. 687).

### 2. Evidence From the State-Agency Experts

On December 29, 2015, state-agency expert Dr. Charles Kenney issued a report finding that Claimant suffered from Crohn's disease but that it did not constitute a severe impairment.[3] (R. 73). Dr. Sai Nimmagadda agreed with Dr. Kenney's assessment on April 1, 2016. (R. 83). Two state-agency psychologists also issued reports. Dr. David Voss found on December 24, 2015 that Claimant did not have a mental impairment. (R. 73). On April 1, 2016, however, Dr. David Biscardi determined on reconsideration that Claimant suffered from an affective disorder that imposed mild restrictions on his activities of daily living ("ADLs"), social functioning, and ability to maintain concentration, persistence, or pace. (R. 84).

---

[2] Tenosynovitis is an inflammation of the sheath that covers a tendon. https://medlineplus.gov/ency/article/001242 (last visited Dec. 3, 2019).

[3] "Crohn's disease is an inflammatory bowel disease" that can cause abdominal pain, cramping, sudden bowel movements, and diarrhea. *See* https://www.mayoclinic. org/diseases-conditions/crohns-disease/symptoms-causes/syc-20353304 (last visited on Nov. 21, 2019). It can also cause arthritis. *See* https://www. crohnscolitisfoundation.org sites/default/files/legacy/assets/pdfs/arthritiscomplications (last visited Nov. 21, 2019) ("Arthritis, or inflammation (pain with swelling) of the joints, is the most common extraintestinal complication of" Crohn's).

In addition to these non-examining experts, clinical psychologist Dr. Shannon Doyle examined Claimant at the SSA's request on December 15, 2015. She found that his mood was euthymic and that his affect was appropriate. Claimant was oriented to person, place, and time. Dr. Doyle concluded that he did not meet the criteria for any psychiatric disorder. (R. 513-15).

### 3. Evidence From Claimant's Treating Sources

Three of Claimant's treating doctors issued reports about the effect that Crohn's or Crohn's-related arthritis had on his physical functioning. Treating physician Dr. Sharon Berliant issued her report on June 1, 2016. She noted that Claimant's Crohn's disease gave rise to abdominal pain that resulted in pain levels of seven out of ten several times each week as well as ankle and back pain. Claimant's condition would also cause him to have good days and bad days. Dr. Berliant stated that stress caused an inflammatory response that increase the symptoms of Crohn's disease and that Claimant would "possibly" be able to tolerate a low-stress job. He could sit for two hours each workday but only stand and walk for less than two hours. Claimant could lift 10 pounds frequently and 20 pounds occasionally. (R. 561-64).

Treating rheumatologist Dr. Lori Siegel issued a report on June 23, 2016. She found that Claimant's impairments created "severe pain" in his ankles, back, and sacroiliac joints. Like Dr. Berliant, Dr. Siegel also found that stress worsened Claimant's symptoms and that he would require a "*very low* stress job." (R. 571) (emphasis in original). Claimant's impairments would fluctuate and give rise to good days and bad days. Dr. Siegel stated that Claimant could sit for only one hour before needing a break and could stand for 30 minutes before needing to sit down. She agreed with Dr. Berliant that Claimant could lift 10 pounds frequently and 20 pounds occasionally. (R. 570-74).

4

Treating gastroenterologist Dr. Cynthia Wait issued her opinion on June 4, 2017. She found that Claimant's pain registered as three to six out of ten each day and that his medications provided "no benefit." Dr. Wait agreed with the other treating sources that Claimant's condition was "worse [with] stress" and that he would have good days and bad days. (R. 714). She further stated that Claimant would need to take bathroom breaks that lasted between 10 and 15 minutes each. The need for breaks would arise "unpredictably" and with "very little advance notice." (R. 717).

### C. Evidence From Claimant's Testimony

Claimant appeared at an administrative hearing on August 2, 2017 and described his condition to the ALJ. Claimant stated that he worked as an IT manager with Walgreens Corporation until he was let go in August 2015 as part of a corporate downsizing effort. (R. 45-46). The ALJ only minimally inquired into Claimant's condition. Claimant testified that his Crohn's symptoms fluctuate and that he needs to go to the bathroom from two to twelve times a day. (R. 50). The pain in his abdomen associated with Crohn's is constant. (R. 50). He experiences flare ups and bacterial overgrowth that require him to take Prednisone once every two months. (R. 52). He has also taken Humira injections once a week after being diagnosed with Crohn's-related arthritis. (R. 54). Humira helps – but does not eliminate – his pain. Claimant rated his pain as seven or eight out of ten during a flare up. (R. 58). Claimant briefly described his ADLs as limited in nature. He stated that "most days, it's a back and forth from the bed to the bathroom, the chair to the bathroom." (R. 57). He can groom himself but does not engage in significant cleaning, cooking, or shopping. (R. 57).

### D. The ALJ's Decision

On February 23, 2018, the ALJ issued a decision finding that Claimant was not disabled. Applying the five-step sequential analysis that governs disability determinations, the ALJ found at Step 1 that Claimant had not engaged in substantial gainful activity since his alleged onset date of August 20, 2015. His severe impairments at Step 2 were Crohn's disease, irritable bowel syndrome, and Crohn's-related arthritis. None of these impairments met or medically equaled a listing at Step 3 either singly or in combination.

Before moving to Step 4, the ALJ considered Claimant's testimony on the frequency and severity of his impairments. He determined that the record was not fully consistent with the description that Claimant gave of his condition. The ALJ also assigned weights to a variety of reports issued by Claimant's treating physicians and the state-agency experts. He gave "little" weight to the state-agency experts Dr. Kenney and Dr. Nimmagadda. "Great" weight was given to the state-agency psychologist Dr. Voss but "less weight" was assigned to psychologist Dr. Biscardi. The ALJ dismissed the reports of treating physicians Dr. Sharon Berliant, Dr. Lori Siegel, and Dr. Cynthia Wait. The ALJ then found that Claimant had the RFC to carry out sedentary work as that term is defined in 20 C.F.R. § 404.1567(a) except that he could only rarely climb ladders, ropes, scaffolds, or ramps and could rarely stoop or crouch.

Based on these findings and the testimony of a vocational expert ("VE"), the ALJ determined at Step 4 that Claimant could perform his past relevant work as an IT manager. Accordingly, the ALJ found that Claimant was not disabled without moving to Step 5. (R. 25-33).

## II. LEGAL ANALYSIS

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his or her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of his past

relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*. If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. An individual is not disabled if he or she can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

B.   **Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## III. DISCUSSION

Claimant argues that the Commissioner's decision requires remand because the ALJ (1) erred in evaluating Claimant's RFC, (2) incorrectly assessed his symptom testimony, and (3) erroneously evaluated the expert reports of Claimant's treating sources.

### A. The ALJ's RFC Assessment Was Erroneous

The RFC addresses the maximum work-related activities that a claimant can perform despite the limitations that stem from his or her impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The task of assessing a claimant's RFC is reserved to the Commissioner instead of to a medical expert. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). "In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do." *Id*. Such evidence includes the claimant's medical history; the effects of treatments that he or she has undergone; the reports of activities of daily living ("ADL"); medical source statements; and the effects of the claimant's symptoms. SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).

The RFC must accommodate all of a claimant's limitations that are supported by the record. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). In addition, an ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. That includes an explanation of why the claimant is able "to perform sustained work activities in an ordinary work setting on a regular and continuing basis" eight hours a day for five days a week. *Id*.

In this case, the ALJ did not have an RFC from a medical expert to guide his assessment of the work that Claimant could perform: the ALJ rejected the opinions of the state-agency experts because they found that Claimant's Crohn's disease was not a severe impairment; he also rejected the reports of Claimant's treating sources – Dr. Berliant, Dr. Wait, and Dr. Siegel – who assessed a variety of exertional restrictions stemming from his Crohn's symptoms. The absence of an expert opinion did not prevent the ALJ from determining the work that Claimant could perform because the RFC constitutes a legal – not a medical – decision for the ALJ to make. *See Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014). However, an ALJ cannot reject all the relevant medical RFC opinions and then "construct[] a 'middle ground' and c[o]me up with her own physical RFC assessment" without logically connecting the evidence to the RFC findings. *Bailey v. Barnhart*, 473 F.Supp.2d 822, 838 (N.D.Ill. 2006) (emphasis omitted); *see also Norris v. Astrue*, 776 F.Supp.2d 616, 637 (N.D.Ill. 2011) ("The ALJs are not permitted to construct a 'middle ground' RFC without a proper medical basis."). An ALJ must always follow SSR 96-8p's directive to provide a narrative explanation of how he arrived at his conclusion and build a logical bridge between the record and the RFC assessment.

Neither the ALJ nor the Commissioner has explained how the ALJ complied with this standard. The ALJ reviewed the medical evidence in some detail but "[m]erely summarizing the record . . . is not in itself a substitute for an ALJ's duty to explain the basis of" his findings. *Elmalech v. Berryhill*, No. 17 C 8606, 2018 WL 4616289, at *10 (N.D.Ill. Sept. 26, 2018); *see also Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (explaining that the "record as whole" cannot be used to fill gaps in the ALJ's reasoning).

The Commissioner attempts to defend the ALJ's RFC reasoning on two grounds. First, the Commissioner claims that the ALJ "reasonably determined" that sedentary work was

10

appropriate for Claimant but does not cite any evidence to support such a position. That fails to address the logical basis of the ALJ's reasoning. *See Lopez v. Berryhill*, 340 F.Supp.3d 696, 704 (N.D.Ill. 2018) (rejecting the Commissioner's claim that an ALJ acted "reasonably" as "nothing more than an unadorned, and illogical *ipse dixit* . . . [that is] hopelessly at odds with the logical bridge requirement"). Second, the Commissioner notes that the ALJ stated that Claimant suffered from "fatigue, joint pain, and abdominal pain." Clearly, the RFC was based on the fact that Claimant experienced exertional limitations that stemmed from these symptoms of Crohn's disease. Without addressing the *severity* of those symptoms, however, the Commissioner does not explain why Claimant was restricted to sedentary work instead of, say, medium work, light work, or no work at all.

The Commissioner overlooks that SSR 96-8p instructs ALJs to provide "a logical explanation of the effects of symptoms, including pain, on the individual's ability to work." 1996 WL 374184, at *7. The ALJ's failure to follow this directive can be illustrated by the disparity between his account of Claimant's symptoms and the RFC he assessed. Sedentary work involves serious exertional restrictions. *See* SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996) ("Under the regulations, 'sedentary work' represents a *significantly* restricted range of work. Individuals who are limited to no more than sedentary work by their medical impairments have *very serious* functional limitations.") (emphasis added). Contrary to that standard, the ALJ emphasized that Claimant's impairments did *not* involve serious symptoms. He noted, for example, that Claimant's Crohn's-related diarrhea was only "sporadic" or "occasional" and his Crohn's symptoms were "well controlled on medication." (R. 29, 31). Objective imaging such as MRIs of Claimant's joints were "unremarkable" and inconsistent with Claimant's alleged symptoms. (R. 30). Prednisone made Claimant's joints feel "great" and his physical exams

11

showed only "relatively benign" findings. (R. 30). The ALJ concluded that Claimant had "no significant abnormalities" related to Crohn's-related arthritis and that his Crohn's disease was merely "quiescent." (R. 31).

The Court is unable to discern how the ALJ derived the RFC of sedentary work from this benign account of Claimant's condition. He stated that Claimant could rarely stoop, crouch, or climb ladders but the decision does not cite anything about Claimant's ability to carry out these activities. In addition, a sedentary RFC limits a person to lifting or carrying up to 10 pounds at a time, 20 C.F.R. § 404.1567(a), but the ALJ never discussed Claimant's capacity for lifting or carrying. In fact, he did not even ask Claimant about his exertional abilities at the hearing or address his ADLs in the decision. *See* SSR 96-8p, 1996 WL 374184, at *5-7 (instructing ALJs to consider a claimant's reported ADLs and to include "a thorough discussion and analysis of . . . the individual's complaints of pain and other symptoms").

The ALJ's failure to tie the record to the RFC is especially apparent when his findings are compared to the ALJ's assessment of the treating source reports. The ALJ rejected Dr. Siegel's opinion that Claimant could lift up to 10 pounds frequently and 20 pounds occasionally on the ground that no "significant abnormalities" supported her finding and that her expert report was unduly "sympathetic" to Claimant. (R. 31). The ALJ then construed the same record to mean that Claimant could only lift up to 10 pounds at a time – only half of what Dr. Siegel said he could lift. The record cannot logically support both of these findings. Other contradictions are also present that the ALJ failed to note. Dr. Siegel said that Claimant could only "rarely" stoop, crouch, or climb ladders. (R. 573). The ALJ agreed with these conclusions even though he rejected Dr. Siegel's report in its entirety. (R. 31). The same is true for the report of treating physician Dr. Berliant, who found that Claimant could "occasionally" (meaning up to one-third

of the time) twist, stoop, and climb. The ALJ also rejected Dr. Berliant's report as "sympathetic" and at odds with the record.

As these contradictory accounts show, the ALJ relied on the record to reach a variety of conflicting findings without linking the evidence to the RFC of sedentary work. Even if the record supports the ALJ's ultimate RFC conclusions, moreover, it is well established that remand is required when an ALJ fails to explain the basis of his reasoning and to build a logical bridge between the evidence and his findings. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[W]e cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) ("Contrary to SSR 96-8p, however, the ALJ did not explain how he arrived at these [RFC] conclusions; this omission in itself is sufficient to warrant reversal of the ALJ's decision.").

In addition to these oversights, the ALJ failed to evaluate three lines of evidence that cast additional doubt on the RFC assessment. First, Claimant testified that stress made his Crohn's symptoms worse. (R. 29). Significant evidence supported Claimant's allegation. Dr. Siegel placed particular emphasis on this issue by stating that Claimant was only capable of working under "*very low* stress." (R. 605) (emphasis in original). Treating physicians Dr. Berliant and Dr. Wait agreed with that assessment. (R. 562, 715). Claimant also told gastroenterologist Dr. Patricia Sun in November 2015 that his Crohn's symptoms had "almost completely resolved" after he was laid off from work in September 2015. (R. 482). Indeed, the ALJ himself recognized that Claimant's Crohn's symptoms were significantly more serious when he was

13

working.[4] (R. 29). The record confirms that finding: in December 2011, Dr. S.V. Kane of the Mayo Clinic stated that – despite the "well controlled" nature of Claimant's Crohn's – he experienced chronic pain that necessitated treatment from a pain clinic and a psychologist. (R. 617, stating "that Mr. [J.] is, indeed, disabled from his pain issues right now").

The ALJ briefly noted that Claimant testified that stress exacerbated his symptoms but never evaluated the issue or addressed the available evidence. The issue was crucial because the RFC was based solely on the medical records gathered *after* Claimant stopped working. If work stress made his condition worse – and his treating physicians unanimously stated that it did – those records generated *after* Claimant ceased working may not have accurately reflected what Claimant's Crohn's symptoms would be like if he worked without a stress-related accommodation in the RFC. By failing to address the connection between work-related stress and Crohn's disease, therefore, the ALJ relied on evidence that supported his finding without considering other parts of the record that might have required a different conclusion. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

Second, Claimant testified that his bathroom breaks took up to 15 or 20 minutes per visit. The ALJ never evaluated this allegation and did not ask the VE if Claimant could carry out his past relevant work if such lengthy breaks were necessary. That was erroneous because an ALJ

---

[4] The ALJ implied that it was significant that Claimant continued to work prior to his alleged onset date despite his aggravated Crohn's symptoms. (R. 29-30). On remand, the ALJ should consider that Claimant stated that Crohn's had caused "a large absence" in his attendance at work and that he had applied for medical leave during his last year of work at Walgreens. (R. 206). The Seventh Circuit has stressed that "the fact that a person holds down a job doesn't prove that he isn't disabled, because he may have a careless or indulgent employer or be working beyond his capacity out of desperation." *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003).

must determine how long a person suffering from a bowel disorder needs for breaks and whether an employer could tolerate such work interruptions. *See Sikorski v. Berryhill*, 690 Fed.Appx. 429, 433 (7th Cir. 2017) (remanding when the "ALJ did not resolve whether Sikorski's bathroom visits required five minutes, a duration that the VE said employers generally accommodate, or ten minutes, which the VE testified would render her unemployable"); *see also Manker v. Berryhill*, No. 16 C 10704, 2017 WL 6569719, at *4 (N.D.Ill. Dec. 22, 2017) (stating the duration of bathroom breaks "is highly relevant to the denial of benefits" for a claimant suffering from irritable bowel syndrome).

The ALJ may have thought that he dealt with this issue by giving little weight to the report of gastroenterologist Dr. Wait, who stated that Claimant would need bathroom breaks that lasted between 10 and 15 minutes at a time. (R. 31). The ALJ claimed that Dr. Wait's opinion was inconsistent with her treatment notes and the record as a whole. The Court disagrees with this reasoning. It is true that Dr. Wait's notes do not state how long Claimant would need to be in the bathroom but "the mere absence of detailed treatment notes, without more, is insufficient grounds for disbelieving the evidence of a qualified professional." *Brown v. Colvin*, 845 F.3d 247, 253 (7th Cir. 2016) (internal quotes and citation omitted); *see also Rogers v. Barnhart*, 446 F.Supp.2d 828, 857 (N.D.Ill. 2006) (noting that "inferences from silence in a clinician's progress notes may be perilous"). Instead, an ALJ must rely on evidence that contradicts what the treating source states. *Brown*, 845 F.3d at 253. The ALJ cited records showing that the *frequency* of Claimant's bathroom trips was not as great as Claimant alleged but that does not address – much less contradict – what Dr. Wait stated about the *duration* of those breaks.

Third, Dr. Wait, Dr. Berliant, and Dr. Siegel each stated that Claimant's impairments would give rise to good days and bad days. The ALJ was required to consider those statements

15

because SSR 96-8p requires a narrative discussion of a claimant's "ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis[.]" 1996 WL 374184, at *7. The ALJ overlooked what Claimant's treating physicians stated on this issue and did not ask Claimant about it at the hearing. Remand is therefore required so that the ALJ can explain with greater care how the record supports the RFC assessment of sedentary work. *See Brown v. Barnhart*, 298 F.Supp.2d 773, 798 (E.D.Wis. 2004) ("Because the ability to work includes the ability to do sustained work activities on a regular and continuing basis . . . [an] alleged inability to function on certain days should have been considered.") (citing SSR 96-8p).

**B.     The ALJ Should Reconsider the Treating Source Statements**

The ALJ assigned little weight to the reports of Claimant's treating physician Dr. Berliant, his treating rheumatologist Dr. Siegel, and gave partial weight to one statement of gastroenterologist Dr. Wait that Claimant had daily pain on a scale of three to six out of ten. (R. 31). Since this case already requires remand, the ALJ should reconsider his reasons for those assessments. As noted above, *supra* at Section IIIA, the ALJ failed to grasp that his RFC was equal to – or even more restrictive than – some of the findings of Claimant's treaters. Accordingly, the ALJ could not logically reject all aspects of the expert reports without implicitly contradicting his own RFC assessment. The ALJ should therefore have evaluated the separate sections of these reports with greater care instead of rejecting them as a whole. *See McMurtry v. Astrue*, 749 F.Supp.2d 875, 888 (E.D.Wis. 201) ("A treating physician's opinions may have several points; some may be given controlling weight while others may not."); *see also King v. Berryhill*, No. 17 C 8712, 2018 WL 6179092, at *4 (N.D.Ill. Nov. 27, 2018).

The ALJ also claimed that Dr. Berliant's and Dr. Siegel's reports were "sympathetic" opinions, (R. 31), but he did not cite any evidence to support that claim. Such conclusory

16

evaluations are not sufficient to reject a treating source. "The ALJ must have a substantial evidentiary basis for finding a bias by the treating physician, and an otherwise medically valid opinion will not be ignored merely because of speculation that the physician was sympathetic to the claimant." *Goyco v. Colvin*, 2014 WL 5152570, at *5 (N.D.Ill. Oct. 14, 2014) (citing *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009)) (internal quotes omitted); *see also Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir. 1993) (stating that "there is no presumption of bias in a treating physician's disability opinion").

The Commissioner claims that the ALJ had reason to discount Dr. Berliant's report as sympathetic because she had treated Claimant for 19 years. Contrary to that reasoning, the regulations state that "[g]enerally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i). The Commissioner also defends the ALJ's dismissal of Dr. Siegel's report because she only treated Claimant twice and used conservative measures. The ALJ never relied on that reasoning to discount Dr. Siegel's report, however, and the Commissioner cannot defend his decision on grounds that the ALJ did not cite. *See*, *e.g.*, *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

Finally, the ALJ credited part of Dr. Wait's findings because she "is a treating provider who specializes in gastroenterology." (R. 31). A treating source with specialized knowledge of a claimant's condition is ordinarily entitled to greater weight than an expert who is not a specialist. 20 C.F.R. § 404.1527(b)(5). The ALJ failed to explain, however, why he credited some of Dr. Wait's findings on this ground but not others. He also overlooked that the same reasoning applied to Dr. Siegel who had specialized knowledge of Claimant's joint condition. The ALJ did not have to accept what these treating sources stated based on their specialization;

17

however, he could not selectively apply the standard he used to credit some of their findings without explaining why the same reasoning did not apply to other parts of the reports. Remand is therefore required so that the ALJ can reconsider the weights he gave to the reports of Claimant's treating sources.

**IV.    CONCLUSION**

For the reasons stated above, Claimant's motion for summary judgment [14] is granted. The Commissioner's cross-motion for summary judgment [21] is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ shall (1) restate the reasons for the RFC assessment and (2) restate more fully the reasons for the weights given to the expert reports of Dr. Siegel, Dr. Berliant, and Dr. Wait.

>   **Hon. Jeffrey Cummings**
>   **United States Magistrate Judge**

**Dated:  January 23, 2020**